## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS – FORT WORTH DIVISION

| | | |
|---|---|---|
| DAVID BAKUTIS, as Administrator for the ESTATE OF ATATIANA JEFFERSON, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 4:21-cv-665-Y |
| | : | |
| v. | : | |
| | : | |
| AARON DEAN | : | JURY TRIAL DEMANDED |
| | : | |
| And | : | |
| | : | |
| THE CITY OF FORT WORTH | : | |
| | : | |
| Defendants. | : | |
| | : | |

### PLAINTIFF'S SECOND AMENDED COMPLAINT

NOW COMES David Bakutis, as Administrator for the Estate of Atatiana Jefferson, complaining of Defendants Aaron Dean and the City of Fort Worth, Texas ("the City") and for cause would show the Honorable Court as follows:

1. On October 12, 2019, Atatiana Jefferson was shot and killed by Aaron Dean, a Fort Worth, Texas police officer.

2. This is an action brought by the Plaintiff against Defendants, Fort Worth, Texas, and its agent and servant, former Police Officer Aaron Dean, for Dean's use of excessive and deadly force under the color of state law resulting in the death of Atatiana Jefferson in violation of her rights under the Fourth Amendment of the United States Constitution secured pursuant to 42 U.S.C. § 1983.

3. Plaintiff, David Bakutis, Esquire, is the duly appointed temporary administrator of the Estate of Atatiana Jefferson.

4.  Atatiana Jefferson died intestate.  She was unmarried and had no children.  She was survived by her mother Yolanda Carr.

5.  Yolanda Carr was the mother of Atatiana Jefferson.

6.  Yolanda Carr passed away on January 9, 2020.  She survived her daughter by 90 days.

7.  Jerome Eschor is the biological father of Atatiana Jefferson. Jerome Eschor survives his daughter.

8.  Plaintiff brings this action pursuant to Texas's survivorship statutes as the duly appointed temporary administrator of the Estate of Atatiana Jefferson.

9.  Plaintiff brings this action pursuant to Texas's wrongful death statute on behalf of Ms. Jefferson's putative wrongful death beneficiaries.

10. Plaintiff alleges that Defendant Dean violated decedent's constitutional rights when he unlawfully entered her property and shot her to death.

11. Plaintiff alleges that the City of Fort Worth, Texas, failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise properly equip and control officers including those who are known, or who should have been known, to engage in the use of excessive force and/or deadly force.

12. The City had a duty, but failed, to implement and/or enforce training, policies, practices and procedures for the Fort Police Department that respected Plaintiff's constitutional rights.

13. Defendant City's failure to adequately supervise, discipline, and train Defendant Dean, failure to implement the necessary policies and procedures, and affirmative implementation

of unconstitutional policies caused Plaintiff's unwarranted and excruciating physical and mental anguish and death.

14. For these civil rights violations and other causes of action discussed herein, Plaintiff seeks redress and compensation for damages and the wrongful death of Atatiana Jefferson.


## PARTIES

15. Plaintiff David Bakutis is the duly appointed temporary administrator of the Estate of Atatiana Jefferson and is an adult individual and a resident of the state of Texas.

16. Defendant Aaron Dean was at all relevant times a police officer with the Fort Worth Police Department.

17. Defendant Fort Worth, Texas is a municipality duly organized and existing under the laws of the state of Texas.  Defendant Fort Worth, Texas is responsible for the funding, budget, policies, operation, and oversight of the Fort Worth Police Department. The Fort Worth Police Department is also responsible for preventive, investigative, and enforcement services for all citizens of Fort Worth. Defendant Fort Worth may be served at the Office of the City Attorney, 200 Texas St., Fort Worth, TX 76102


## JURISDICTION AND VENUE

18. Jurisdiction exists in this Honorable Court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the Fourth Amendment rights of the decedent Atatiana Jefferson.  Plaintiff further invokes the

supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to adjudicate pendent state law claims.

19. Venue is proper in this Honorable Court as Defendants' constitutional violations and intentional torts and otherwise violative conduct occurred within the Northern District of Texas.

## THE MURDER OF ATATIANA JEFFERSON

20. On or about October 12, 2019, at approximately 2:25 a.m., Fort Worth Police Department received a call on a non-emergency line from James Smith, a neighbor to Ms. Jefferson's residence at 1203 E. Allen Street in Fort Worth.

21. Mr. Smith relayed his concern that the front door of Ms. Jefferson's residence was open.

22. Mr. Smith did not state any other reason to warrant suspicion on the call, only stating that the door is usually closed.

23. At the time, Atatiana Jefferson was in the home, which was owned by her mother, Yolanda Carr.

24. Ms. Jefferson was staying in the home and taking care of her 8-year-old nephew Z.C. due to her mother's hospitalization with medical issues.

25. Ms. Jefferson and her nephew had stayed up late that night playing video games.

26. The door to the home was open to allow a cool breeze into the home.

27. Fort Worth Police Officer Aaron Dean responded to the call and arrived in the vicinity of 1203 E. Allen Street at approximately 2:28 a.m.

28. The radio call Dean responded to was for an "open structure" call.

29. Another unidentified female Fort Worth Police Officer (hereafter "Officer Jane Doe") also responded to the call and arrived at approximately 2:29 a.m.

30. Both Dean and Officer Jane Doe parked their marked police vehicles around the corner from the residence and out of view.

31. Neither Dean nor Officer Jane Doe had activated their emergency lights or sirens.

32. Dean and Officer Jane Doe undertook these actions to intentionally foreclose the opportunity to be identified as police officers.

33. Shortly after arriving, Dean approached the home and looked through the screen window at the front door.

34. At no point did Dean knock on the door, announce himself as a police officer, or give Jefferson and Z.C. any verbal indication that he or Officer Jane Doe were there.

35. Dean proceeded to walk around the corner of the home and look into another screen door on the other side of the home.

36. Dean took these actions without a warrant, probable cause, or reasonable suspicion and in doing so violated Ms. Jefferson's and Z.C.'s privacy rights and the Fourth Amendment.

37. Once again, Dean did not knock on the door, nor did he announce himself as a police officer or give any indication he or Officer Jane Doe were there.

38. Dean continued to search around the outside of the property using a flashlight.

39. Dean and Officer Jane Doe turned on their flashlights and looked in the cars in the driveway.

40. The doors to both cars were closed and there were no signs of a disturbance.

41. Dean also observed the garage, and both doors on the garage were closed.  Similarly, the garage provided no evidence of a disturbance of any kind.

42. Dean also observed the door on the fence next to the garage. The door was closed and there was no visible evidence of a break-in.

43.  Dean then opened the fence door, moved to a window on the side of the home and shined his flashlight into the window.

44. At this point, Dean and Officer Jane Doe had still not given any verbal or physical indication to Jefferson or Z.C. that they were police officers, why they were at the home, or that they were on the property at all.

45. Ms. Jefferson became aware that there were a person or people outside her windows.

46. Ms. Jefferson had no way to know the shadowy figures sneaking around her back yard were police officers and not criminals seeking to rob, rape, or murder her.

47. Ms. Jefferson went to the window to see what was going on.

48. When Ms. Jefferson's figure appeared in the window, Dean immediately pulled out his service weapon and pointed it into the window at Jefferson while simultaneously flashing his flashlight into the window.

49. Dean's view of Ms. Jefferson through the window was obstructed by the reflection of his flashlight.

50. Dean's body camera footage shows that Ms. Jefferson did not point any weapon of any kind at Dean or his partner.

51. When Dean pointed his service weapon into the window, he did not announce himself as a police officer.

52. Instead, immediately upon seeing Ms. Jefferson, Dean began shouting, "Put your hands up! Show me your hands!"

53. While still in the middle of issuing his command, and without giving Ms. Jefferson any chance to respond, Dean fired a single shot into the window, striking Atatiana.

54. After Dean shot Ms. Jefferson, he and Officer Jane Doe entered the house and attempted to give CPR to her as she bled on the floor of her own home in front of her nephew.

55. Jefferson was pronounced dead at the scene at approximately 3:05 a.m.

56. The cause of death was a single gunshot wound.

57. On October 14, 2019, Dean resigned from the Fort Worth Police Department.

58. On that same day, Dean was arrested and charged with murder.

59. On December 20, 2022, Dean was convicted of manslaughter and sentenced to 11 years and 10 months in prison.

## FAILURES OF THE FORT WORTH POLICE DEPARTMENT

60. Between 2005 and 2019, the Fort Worth Police Department has displayed a consistent and systematic failure to properly train and supervise its officers on the proper use of force, and techniques and principles of de-escalation, resulting in numerous incidents of officers unnecessarily using force resulting in serious bodily injury and death, particularly against people of color.

61. These incidents are well known in the Fort Worth community, receiving widespread media coverage.

62. The incidents are known to policymaker Kraus or Price as well.

63. Not only did the Fort Worth Police Department and its policymaker Chief Kraus or Mayor Price tolerate the regular use of excessive force by officers, the Department actively attempted to downplay and cover up the use of excessive force and the commission of crimes by its officers.

64. By tolerating the regular use of excessive force and engaging in cover-ups of the use of excessive force, Fort Worth policymaker Kraus or Price indicated to Fort Worth officers that they were free to use force however they liked without the threat of discipline or accountability.

*Custom of Excessive Force*

Kevin Peterson

65. On August 14, 2005, Fort Worth Police officers violently grabbed Kevin Peterson while he was sleeping in his parked truck and dragged him out of the vehicle.

66. Peterson had done nothing wrong and was sleeping in the truck when approached by the officers.

67. The officers slammed Peterson to the ground before violently slamming his body against the bed of the truck to arrest him, causing serious bodily injuries.

68. Despite Fort Worth PD knowledge of the incident, the officers were not disciplined.

Michael Jacobs Jr.

69. In April 2009, 24-year-old Michael Jacobs Jr. was suffering from a mental health episode after failing to take his medication.

70. Police were called to help get Jacobs to the hospital, however, instead they assaulted him and tasered him repeatedly until he died.

71. Jacobs was unarmed and not suspected of committing any crime.

72. None of the involved officers were disciplined despite Fort Worth PD knowledge of the incident and the City offering the Jacobs family $2 million to resolve litigation arising from his death.

<u>Kevin Malone</u>

73. On July 23, 2009, Fort Worth police officers stopped Kevin Malone, a Black man, for allegedly driving a stolen truck.

74. When the officers pulled Malone over, one of the officers struck Malone with the muzzle of his gun, struck him with his knee, and ordered his canine dog to attack Malone even though Malone was already handcuffed.

75. Despite Fort Worth PD knowledge of the incident, the officers were not disciplined.

<u>Jermaine Darden</u>

76. On May 16, 2013, Fort Worth police officers executed a no-knock warrant at a house which Jermaine Darden, a Black man, was inside.

77. Darden complied with the officers' orders, but nonetheless was choked, kicked, punched, and tasered, causing him to suffer a fatal heart attack.

78. Despite Fort Worth PD knowledge of the incident, the officers were not disciplined.

<u>Nelda Davis</u>

79. On January 1, 2015, Nelda Davis, called 911 to request that a man be removed from her business.

80. When Fort Worth police officers Halmagean and Olson arrived, they instead stated the man must be allowed to enter and attempted to force Ms. Davis to permit the man to enter.

81. Officer Halmagean then grabbed Davis's arm and twisted it behind her back causing it to fracture.

82. Olson and Halmagean then joked that Davis had "learned her lesson" and released her without charging her with a crime.

83. Upon information and belief, despite Fort Worth PD knowledge of the incident, neither Olson nor Halmagean were disciplined.

<u>Phillip Vallejo</u>

84. On July 30, 2015, Phillip and Brenda Vallejo went to Ojos Locos to celebrate Phillip's 30th birthday.  While there, Brenda was harassed by a group of men. Her partner, Phillip Vallejo, got into a verbal altercation with the men until one of the men revealed he had a gun.

85. At that time, Phillip and Brenda exited Ojos Locos and separated from the men.  Shortly thereafter, Fort Worth officer Ochsendorf arrived.

86. Upon arrival, Ochsendorf drew his gun and shot Phillip Vallejo multiple times in the back, killing him.

87. Upon information and belief, despite Fort Worth PD knowledge of the incident, Ochsendorf was not disciplined.

88. A civil suit for excessive force remains pending against Ochsendorf.

<u>Craigory Adams</u>

89. On June 23, 2015, Craigory Adams, a Black man, knocked on a neighbor's door carrying a barbeque fork, which he said he carried around to keep away stray dogs.

90. The neighbor called Fort Worth police.

91. Despite the fact that Adams had not committed a crime and was no threat to anyone, one of the responding officers pointed a shotgun at Adams and discharged it, striking him in the arm.

92. Despite Fort Worth PD knowledge of the incident, none of the involved officers were disciplined.

<u>Daniel Jon Brunley Jr.</u>

93. On December 17, 2015, Fort Worth police officers pulled over Daniel Jon Brunley Jr. for a traffic stop.

94. Despite Brunley being unarmed, one of the officers shot him twice in the back, then shot him twice again, including once in the head, killing him.

95. Despite Fort Worth PD knowledge of the incident, none of the involved officers were disciplined.

<u>David Collie</u>

96. In July of 2016, Fort Worth PD officer Barron shot unarmed David Collie, a Black man, in the back as he walked away from police.

97. Officers initially claimed that Collie had raised a weapon at police, but video capturing the incident disproved this narrative.

98. Collie had committed no crime, but nonetheless was subjected to potentially deadly force by the Fort Worth PD.

99. As a result of the shooting, Collie is now paralyzed from the waist down.

100.     Despite the video capturing the incident which was in the possession of the Fort Worth PD, the involved officers were not disciplined.

Henry Newson

101.     In November 2016, Henry Newson, a Black man, was standing outside the hospital after being discharged waiting for a ride home.

102.     Fort Worth Police arrived while he was being questioned by security about why he was there.

103.     When he refused to leave, a white Fort Worth PD officer punched him in the face.

104.     Upon information and belief, despite Fort Worth PD knowledge of the incident, the officer was not disciplined.

Dorshay Morris

105.     In August 2017, Dorshay Morris, a Black woman, called Fort Worth police to report her boyfriend threatening her. When officers arrived, they treated her like a suspect, and when she refused to give her ID to officers one of the officers grabbed her by the hair.

106.     Fort Worth PD Sergeant Kenneth Pierce, who is white, ordered a rookie officer to shoot Morris with a Taser despite the fact that there was no basis for the use of the Taser.

107.      She was taken into custody and charged with aggravated assault with a deadly weapon and resisting arrest.  The charges were subsequently dropped.

108.     Sergeant Price was initially fired, but ultimately was reinstated due to Fort Worth PD's toothless disciplinary process.

<u>Cody Wayne Seals</u>

109.    On June 1, 2019, Army veteran Cody Wayne Seals, who suffered from post-traumatic

stress syndrome, suffered a mental breakdown in his home. A police stand-off ensued.

110.    Seals exited his home and began walking towards the officers carrying only a

flashlight.

111.    Nonetheless, the officers shot and killed Seals.

112.    Despite Fort Worth PD knowledge of the incident, none of the involved officers

were disciplined.

<u>Unnamed Minor Female</u>

113.    In an incident reviewed by the Fort Worth Police Department Expert Review Panel

(discussed in detail *infra*), Fort Worth PD officers responded to a call for a suicidal teenager.

114.    The young woman refused to get out of a parked car to speak with the officers.  The

officers immediately began to forcibly remove her from the car and slammed her to the

ground.  After they handcuffed her, one officer dragged her across the sidewalk and street

by her hands.

115.    The officer then aggressively pushed her into the car as she begged to speak to her

mother.  As she resisted, the officer grabbed her by her legs and shoved her in; she had

urinated on herself and her shirt fell off exposing her breasts.

116.    The officers made no attempt to de-escalate and did not call a Crisis-Intervention

Trained Officer.  When the young woman stepped outside the car again, nude from the

waist up, an officer sprayed her with pepper spray four times, directly in the face.

117.     Upon information and belief, despite Fort Worth PD knowledge of the incident, none of the involved officers were disciplined.

118.     All of the above-described incidents received substantial media attention and/or were the subject of litigation involving the City of Fort Worth.

119.     As such, Defendants Kraus and Price knew or should have known about each and every incident.

*Custom of Racial Animus and Discrimination*

120.     In December 2018, a task force created by the City of Fort Worth to address issues in race and policing released a report, concluded that the City had failed to address perceptions amongst residents that there was systematic racism in the Fort Worth Police Department.

121.     The task force was asked to "identify patterns and practices related to police interactions with the public during investigative stops, searches, arrests, de-escalation and use of force incidents."

122.     The task force recommended the City have continued conversations with the community but did not recommend any changes to already existing police policies that have disproportionately affected the city's minority community.

123.     In 2017, Black men and women accounted for 18% of the City's population but constituted 41% of the arrests made by Fort Worth PD.

124.     The Fort Worth Police Department's racially discriminatory practices have manifested themselves within the internal operations of the department.

125.     In January 2015, former Police Chief Jeff Halstead resigned after six years on the job.

126.     Halstead resigned after both the Black and Latino officers' associations called for his removal when an investigation documented his failure to address racially hostile behavior within the department.

127.     This racially discriminatory atmosphere is reflected in the employment and promotion practices of Fort Worth PD.

128.     In 2017, Fort Worth PD sworn personnel were 65% white while the Fort Worth population was only 38% white.

129.     The corporal/detective level is the first level of promotion within the Fort Worth PD.

130.     Black Fort Worth PD officers constituted just 7% of corporals/detectives.

131.     Black Fort Worth PD officers were excluded entirely from specialized units within the Fort Worth PD.  In 2017, the following specialized units had zero Black officers:

   a.   SWAT (26 officers);

   b.   K-9 (11 officers);

   c.   Criminal Intelligence (11 officers);

   d.   Homicide (11 officers);

   e.   Major Cases (11 officers); and,

   f.   Robbery (16 officers).

132.     At all relevant times, the City knew of and tolerated racism within the Fort Worth PD.

133.     The City's failure to address these longstanding issues regarding race and the use of excessive force caused the death of Atatiana Jefferson.

*Failure to Discipline and Departmental Ratification and Cover-up of Excessive Force*

134.     On December 21, 2016, Jacqueline Craig, a Black woman, called police after her neighbor, a white man, assaulted her 8-year-old son after he spilled raisins on the ground outside the man's house.

135.     Fort Worth Police Officer, William Martin, responded to the call. One of the first questions Officer Martin asked was, "So why don't you teach your son not to litter?"

136.     After Ms. Craig told him that her neighbor did not have the right to put his hands on her son, whether he had littered, the officer asked, "Why not?"

137.     Officer Martin told her that if she did not stop yelling at him, "you're going to piss me off, and I'm going to take you to jail."

138.     The Officer subsequently falsely arrested Ms. Craig.

139.     The matter was investigated, and the officers who conducted the investigation recommended Officer Martin be terminated.

140.     However, the Fort Worth Police Department only suspended Martin for ten days.

141.     The investigating officers who recommended firing were then demoted for allegedly disseminating a video of the arrest.

142.     The officers filed a whistleblower lawsuit against the City, alleging they were retaliated against for reporting that Martin committed a crime.

143.     A motion for summary judgement filed by the City of Fort Worth was denied, and the lawsuit remains pending.

*Systemic Departmental Failures*

144.     In the wake of the shooting death of Atatiana Jefferson, the City of Fort Worth formed an Expert Panel to analyze the issues and failures within the Fort Worth PD.

145.     The purpose of the Expert Panel review is "to identify patterns and practices related to police interactions with the public during investigative stops, searches, arrests, de-escalation and use of force incidents."

146.     On July 31, 2020, the Expert Panel released its initial findings.

147.     The Expert Panel review of files found a pattern of encounters that start with officers yelling a command, often with weapons drawn, under circumstances where no apparent threat is present.

148.     The Panel additionally found significant evidence of "officers failing to take time to permit a subject to calm down or comply, take advantage of distance, or wait for backup."

149.     As a result of these findings and others, the Panel concluded "that officers are not consistently adhering to policies to avoid force during encounters with community members and **these policies are not enforced by the department**."

150.     The Panel found "that the de-escalation policy is not uniformly followed and is inadequately enforced."

151.    These failures are unsurprising given the Panel's finding that Fort Worth PD has an admitted "para-military" mindset that leads to aggressive tactics from the onset of an encounter.

152.    These consistent failures in the application of use of force policies was reinforced by a disciplinary process that was largely toothless and ignored misconduct by officers.

153.    The panel found "there is no indication that these incidents were analyzed after the fact to determine whether a different course of action may have avoided the need to use force."

154.    Rather, the Expert Panel found the Internal Affairs Department limited review of use of force incidents to "whether force was lawful and did not extend to whether it was avoidable, necessary, or appropriate."

155.    The Expert Panel's findings demonstrate that the City failed to properly train and implement on de-escalation and use of force policies and the end result was a "para-military" police force that was conditioned to strike first, to the detriment of the community and in particular, Atatiana Jefferson.

156.    These failures resulted in Defendant Dean failing to properly respond to the open door call and instead sneak around the house, with a gun drawn, ready to shoot at the first figure that appeared in a window.

157.    The City's failures caused Atatiana Jefferson's death.

*Failure to Screen, Train, and Monitor Defendant Dean*

158.   Aaron Dean was hired to the Fort Worth Police Department despite the Department's knowledge that he had previously sexually assaulted a woman.

159.   In 2004, Dean sexually assaulted a woman at the University of Texas by grabbing her breast without consent.

160.   As a result of the incident, Dean pled no contest to assault by contact.

161.   In video footage of Dean's job interview with the Fort Worth Police Department, Dean described the incident that led to his arrest, stating, "There was a young lady at the school flirting with me. I wanted to respond to see where it would go. It escalated a bit. I touched her inappropriately. It was an inappropriate action. And she, of course, took exception to it and rightfully so."

162.   In that same interview, Dean was asked whether he would be able to kill someone if he had to. Without hesitation, Dean callously answered, "No problem."

163.   Despite Dean's conviction from his sexual assault of a young woman at the University of Texas, Fort Worth Police Department deemed him fit to become an officer and issued him a firearm, one he would later use to murder another innocent young woman, Atatiana Jefferson.

164.   Additional records from Dean's brief 18-month employment with the Fort Worth Police Department show that his conduct as an officer raised serious concerns, even within the hyper-aggressive "paramilitary" culture of the Fort Worth Police Department.

165.     Dean's training records show there were serious concerns about his abilities as a police officer during his first year on the job. His supervisors stated Dean had "tunnel vision" and "needs improvement on communicating with the public and fellow officers."

166.     Despite these concerns and the obvious implication that Dean's deficiencies were likely to result in physical harm or a constitutional violation, the City of Fort Worth never took any additional steps to train Dean.

167.     Further training could have improved Officer Dean and protected the constitutional rights of the citizens he encountered.

168.     The City's failure to provide such training caused the death of Atatiana Jefferson.

*Lack of Policy and Deficient Training on Open Structure Response*

169.     Under Fort Worth PD Directive 327.05, Fort Worth police officers are to investigate reports of "open doors" the same way as they would investigate a call for a "silent alarm," which is covered by Directive 327.01.

170.     In other words, the Fort Worth Police Department does not have a specific policy directive for officers responding to a report of an open door and tells its officers to treat such calls the same as a home's alarm going off.

171.     The department makes no distinction between an alarm going off and a front door being open.

172.     Directive 327.01 does not give any guidance as to how to determine whether there has been a forced entry at a home, how to determine if someone already inside the home is

a burglar or assailant, or when the use of force is appropriate if an officer suspects there is a burglar or assailant inside the home.

173.    Therefore, Fort Worth PD official policy directs officers to respond to a wellness check for an open door in the same manner as they would respond to a burglary in progress, equating a welfare check with an active felony investigation.

174.    This policy is reflective of Fort Worth PD's gross failure to properly train and enforce de-escalation policies.

175.    Instead of knocking on the door and asking if everyone is ok, Fort Worth PD officers are conditioned to act like Navy SEALS, silently sneaking into backyards with firearms drawn, ready to eliminate any potential "threats" – including where it should be obvious no threat exists.

176.    The result of this deficient and thoughtless policy and the abject failure to train and enforce de-escalation concepts was the death of Atatiana Jefferson.

## WRONGFUL DEATH ACTION

177.    Plaintiff David Bakutis, as administrator of the estate of Atatiana Jefferson, deceased, hereby brings these claims pursuant to the Texas Wrongful Death Statute, Tex. Code Ann. § 71.004, on behalf of Yolanda Carr and all those persons entitled by law to recover damages as a result of the wrongful death of Atatiana Jefferson.

178.    No other action has been brought to recover for Atatiana Jefferson's death under the aforementioned statute(s).

179.     Plaintiff claims all available damages under the Texas Wrongful Death Statute for financial contributions and the loss of future services, support, society, comfort, affection, guidance, tutelage, and contributions and the Plaintiff's decedent, Atatiana Jefferson, would have rendered to the wrongful death beneficiaries but for her traumatic, untimely and unnatural death occurring as a result of the unlawful shooting which is subject to the present litigation.

180.     Plaintiff claims damages for all medical bills and/or expenses.

181.     Plaintiff claims damages for payment of funeral and burial expenses.

**SURVIVAL ACTION**

182.     Plaintiff also brings his claims as a Survival Action under the Tex. Code Ann. § 71.021, for all damages recoverable under the Statute, including but not limited to, loss of income both past and future income potential, as well as pain and suffering prior to death, and for the emotional distress suffered by Plaintiff's decedent, Atatiana Jefferson, from the initiation of Defendant Dean's unlawful search tactics until her death.

**COUNT I: FOURTH AMENDMENT VIOLATION
UNLAWFUL SEARCH AGAINST DEFENDANT AARON DEAN**

183.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

184.     Defendant Dean violated the Fourth Amendment rights of Atatiana Jefferson when he entered the side and rear of the property without probable cause or reasonable suspicion.

185.    Plaintiff would show that Defendant Dean denied Jefferson of her right to be secure in her home by unlawfully entering into her backyard in violation of the Fourth Amendment to the United States Constitution.

186.    Defendant Dean engaged in a course of conduct that violated Jefferson's Fourth Amendment rights which began with his unlawful entry onto the property and culminated with his murder of Ms. Jefferson.

187.    Defendant Dean embarked on a willful, malicious, reckless, and outrageous course of conduct that was intended to cause and, in fact, caused Jefferson to suffer extreme and severe mental and emotional distress, anxiety, terror and agony, and ultimately her death.

188.    Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendant Dean, pursuant to 42 U.S.C. § 1983, in an amount in excess of $10 million, including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death damages, punitive and exemplary damages as provided by law, attorneys' fees under 42 U.S.C. §§ 1985 and 1988, and any other damages legally appropriate at the time of jury trial.

### COUNT II: FOURTH AMENDMENT VIOLATION
### EXCESSIVE FORCE AGAINST DEFENDANT AARON DEAN

189.    Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

190.    Defendant Dean violated the Fourth Amendment rights of Atatiana Jefferson when he entered the side and rear of the property without probable cause or reasonable suspicion.

191.    Defendant Dean engaged in a course of conduct that violated Jefferson's Fourth Amendment rights which began with his unlawful entry onto the property and culminated with his murder of Ms. Jefferson.

192.    Plaintiff would show that Defendant Dean failed to act as an objectively reasonable officer would have acted in the same or similar circumstances. That is, Defendant Dean, without justification and the need to do so, used excessive and deadly force as described above and killed Jefferson without legal justification.

193.    The excessive and deadly force used by Defendant Dean was not objectively reasonable, justified, nor was it necessary under the circumstances.

194.    Plaintiff would show that Defendant Dean denied Jefferson of her right to be free from the use of excessive force in violation of the Fourth Amendment to the United States Constitution.

195.    Defendant Dean embarked on a willful, malicious, reckless, and outrageous course of conduct that was intended to cause and, in fact, caused Jefferson to suffer extreme and severe mental and emotional distress, anxiety, terror and agony.

196.    Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendant Dean, pursuant to 42 U.S.C. § 1983, in an amount in excess of $10 million, including interest, delay damages, costs of suit, general and specific damages, including both survival and wrongful death

damages, punitive and exemplary damages as provided by law, attorneys' fees under 42 U.S.C. §§ 1985 and 1988, and any other damages legally appropriate at the time of jury trial.

### COUNT III: MUNICIPAL LIABILITY
### AGAINST DEFENDANT THE CITY OF FORT WORTH

197.     Plaintiff hereby incorporates all preceding paragraphs as if fully stated herein.

198.     The customs, practices, and policies of the City of Fort Worth were a moving force behind Defendant Dean's violation of Atatiana Jefferson's constitutional rights.

199.     Jefferson was deprived of rights and privileges secured to her by the United States Constitution and by other laws of the United States, by the City of Forth Worth through its many failures addressed *supra*.

200.     Policymaker Kraus or Price knew of the failures of the Fort Worth Police Department as discussed herein but failed to take the necessary steps to rectify the failures and adequately protect the constitutional rights of the people of Fort Worth.

201.     These failures and the refusal to rectify them were the moving force behind the deprivation of Atatiana Jefferson's constitutional rights.

202.     Plaintiff seeks survival damages, as stated above, including for the nature and extent of Decedent's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff demands judgement in his favor, and against Defendant the City of Fort Worth pursuant to 42 U.S.C. § 1983, in an amount in excess of $10 million, including interest, delay damages, costs of suit, general and specific damages, including both survival and

wrongful death damages, attorneys' fees under 42 U.S.C. §§ 1985 and 1988, and any other

damages legally appropriate at the time of jury trial.

Respectfully submitted,

 /s/ John J. Coyle

McEldrew Purtell                                              Merritt Law Firm
Daniel N. Purtell, Esq.                                      S. Lee Merritt, Esq.
John J. Coyle, Esq.
Mark V. Maguire, Esq.                                  1910 Pacific Ave
123 South Broad Street                                 Suite 8000
Suite 2250                                                     Dallas, TX 75201
Philadelphia, PA 19109                               215-545-8800
215-545-8800                                               lee@leemerrittesq.com
dan@mceldrewyoung.com
jcoyle@mceldrewyoung.com
mmaguire@mceldrewyoung.com


Reed Smith
Rizwan A. Qureshi, Esq.
John P. Kennedy, Esq.

1301 K Street, N.W.
Suite 1000
Washington, D.C. 20005
202-414-9200
rqureshi@reedsmith.com

599 Lexington Avenue, 22nd Floor
New York, NY 10022
212-521-5400
jkennedy@reedsmith.com


Date: April 24, 2023